***********
This matter was reviewed by the Full Commission based upon the record of the proceedings before Deputy Commissioner Ledford, along with the briefs and arguments on appeal. The appealing party has shown good ground to receive further evidence or to amend the prior Opinion and Award. Accordingly, the Full Commission AFFIRMS IN PART AND REVERSES IN PART the Deputy Commissioner's holding, and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties at the hearing before the Deputy Commissioner as:
 *********** STIPULATIONS
1. The parties are properly before the Industrial Commission and were subject to and bound by the provisions of the North Carolina Workers Compensation Act at all relevant times.
2. The employee-employer relationship existed between plaintiff and defendant-employer on each of the following dates: March 5, 1998, June 15, 1998, January 29, 1999, and April 11, 2001.
3. Allied Signal, Inc./Honeywell International Polymers was the employer, insured by The Travelers on March 5, 1998, and by Zurich on June 15, 1998, January 29, 1999, and April 11, 2001, the dates of the alleged injury or occupational disease.
4. Plaintiff's average weekly wage will be determined by the Industrial Commission.
5. Plaintiff's employment at Honeywell was as follows: from February 8, 1988 until December 11, 1988 she was an 02 operator-fibers; from December 12, 1988 until July 30, 1989 she was a 03 operator-fibers; and from July 31, 1989 to present her job title is spin draw operator.
6. The summary of plaintiff's dates worked and dates out-of-work on medical leave from 1998 forward may be received into evidence.
7. The plaintiff was paid short-term disability benefits pursuant to a company plan that is totally funded by the employer as follows:
• March 10, 1998 — April 27, 1998: $2,111.23
• May 18, 1998 — July 16, 1998: $2,585.19
• February 14, 1999 — March 31, 1999: $1,919.03
• February 27, 2001 — August 27, 2001: $10,337.17
8. It is stipulated and agreed that each of the plaintiff's claims was denied as evidenced by IC Forms 33 and 33R.
9. The parties stipulate and agree that all Industrial Commission forms, wage records and a Form 22, all discovery responses, the plaintiff's medical records, the plaintiff's job description and job video may be received into evidence.
10. The plaintiff alleges that she sustained a compensable injury/occupational disease to her left shoulder and left upper extremity on March 5, 1998, June 15, 1998, January 29, 1999 and April 11, 2001. All defendants have denied each of plaintiff's claims. Plaintiff is seeking compensation for medical treatment, temporary total and permanent partial disability benefits.
 ***********
Based upon the evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. On the date of hearing, the plaintiff was 55 years of age. She completed the 11th grade and then got her GED. She went to Central Carolina Community College, taking basic classes such as English, reading, and biology.
2. Plaintiff began working for Defendant Honeywell International Polymers, (formerly Allied Signal, Inc.) on February 8, 1988. She continued to work there until August 28, 2001. On July 31, 1989, the plaintiff became a spin draw operator.
3. As a spin draw operator, plaintiff's duties included stringing up yarn panel, doffing, i.e. handling and removing packages of spools of yarn from the winder, fixing breaks, and pushing buggies containing packages of yarn. She also spent time performing general housekeeping or cleanup duties in her work area. Plaintiff worked a 12-hour shift, during which time she had three 20-minute breaks and one 30-minute break for lunch.
4. As a spin draw operator, plaintiff had to reach, push and pull about 3 to 4 hours per day. In her primary responsibility of doffing, she handled about 30 packages of yarn per hour, or one every 2 minutes, each weighing 28 pounds, and some up to 32 pounds, depending on the type of yarn being run. These yarn packages must be removed from the winder and placed onto a rack or "buggy." This buggy as depicted in the videotape has four rows which each hold four packages of yarn and the top row is above shoulder height for an average person and particularly for plaintiff who is 5 feet 4 inches tall. After the buggy is filled, the spin draw operator is responsible for pushing the buggy to the next destination. A full buggy weighed about 900 to 1,000 pounds.
5. Plaintiff was also charged with fixing yarn breaks (breakouts), which involved the use of an aspirator hose at shoulder level and above. The aspirator hose weighed about 10 to 12 pounds. It took an average of 5 to 7 minutes to restring a breakout, and there were about 8 breakouts per shift. In order to correct a break, the plaintiff had to use the aspirator hose containing yarn, and manually restring the machine. Restringing required winding yarn into different positions onto the machine with the arms extended in front of the body while handling the aspirator hose. Winding the yarn required approximately 30 — 40 circular rotations with the arms extended holding the aspirator hose, with 20 or more of those rotations reaching at or above shoulder level.
6. On March 6, 1998, the plaintiff went to see the company doctor complaining of left shoulder pain. She reported that she had been experiencing left arm and shoulder pain for more than a year. She said her arm felt heavy and she could not raise her arm above shoulder level. The company doctor diagnosed bursitis of the left shoulder and placed her out of work.
7. As stipulated by the parties, the plaintiff was out of work due to symptoms related to her left shoulder and upper extremity during the following dates: March 6, 1998 through April 30, 1998; May 14, 1998 through July 16, 1998; February 10, 1999 through April 5, 1999; and from March 1, 2001 through the date of the hearing before the Deputy Commissioner and continuing.
8. After her initial assessment by the company physician, on March 9, 1998, plaintiff was seen at Sandhills Family Practice. She complained of a painful left shoulder, going on for about a year. The assessment was impingement verses tendonitis/bursitis, and it appeared that she had some adhesive capsulitis, with a decreased range of motion. If her complaints continued, an MRI was recommended to rule out a rotator cuff tear.
9. On April 6, 1998, plaintiff was examined by Dr. Michael J. Tyler at Family Practice Center of Sanford, Inc. On initial assessment, Dr. Tyler notes that this was not due to an accident, but "is related to her repetitive work done as a spin draw operator with Allied Signal." Between April 1998 and February 2002, plaintiff was treated by Dr. Michael J. Tyler and his colleague Dr. Frederica J. Nanni. The records from Dr. Tyler and Dr. Nanni indicate that they diagnosed and treated the plaintiff for left shoulder pain, referred to variously as rotator cuff injury and subscapular tendonitis and overuse syndrome. Both of these doctors acknowledged in the medical records that the plaintiff's shoulder and left upper extremity problems were aggravated by the plaintiff's overhead work.
10. Dr. Timothy Allen, a surgeon with Sanford Surgical Clinic evaluated the plaintiff's symptoms in her hand and wrist on September 19, 2001. She was referred to Dr. Allen by Dr. Tyler due to persistent problems. Dr. Allen diagnosed "bilateral carpal tunnel syndrome, work-related." Although Dr. Allen related this to plaintiff's work, there is no evidence that plaintiff's work placed her at an increased risk for developing carpal tunnel syndrome (CTS).
11. Dr. Allen's testimony is contradicted by the testimony of Dr. Edwards, who conducted an independent medical examination of Plaintiff on June 12, 2002. Dr. Edwards found that her carpal tunnel syndrome was not work-related. As Dr. Edwards noted, and as depicted on the video of the spin draw operator, the plaintiff's job duties did not require strenuous or repetitive finger or wrist flexion, which would tend to cause or aggravate carpal tunnel syndrome.
12. Dr. Edwards specifically assessed plaintiff's complaints with her left shoulder and arm. Upon examination, the impingement maneuver caused plaintiff pain, which was some evidence of that condition. Dr. Edwards did not make a distinct diagnosis other than left shoulder "strain." Dr. Edwards testified that while he did not feel comfortable assessing impingement syndrome, he could not rule it out. He described impingement syndrome as a combination of bursitis and tendonitis. It was Dr. Edwards' opinion that plaintiff's left upper extremity was not specifically aggravated by her work.
13. Plaintiff came under the care of Dr. David Ciliberto, an orthopaedic surgeon, who first examined her on August 6, 2002. An MRI done on October 21, 2002, showed an abnormality of the shoulder and Dr. Ciliberto assessed rotator cuff impingement syndrome of the left shoulder, and suggested surgery.
14. On December 19, 2002, Dr. Ciliberto performed surgery on the plaintiff's left shoulder, an acromioplasty. The surgery revealed compression of the rotator cuff and erosion or partial necrosis of the subacromial bursa, and confirmed Dr. Ciliberto's assessment of rotator cuff impingement syndrome.
15. Dr. Ciliberto reviewed the videotape depicting plaintiff's job duties. He is of the opinion, as he testified, that plaintiff's job duties, particularly the repetitive activities at shoulder elevation and above, aggravated her impingement syndrome. Dr. Ciliberto testified that the activities depicted with the shoulder elevated "would cause compression of the rotator cuff in a person who was developing an impingement syndrome." He assessed plaintiff with a ten percent permanent impairment to her left upper extremity.
16. The medical evidence contains different terms for the physicians' assessments of plaintiff's condition, including bursitis, tendonitis, and shoulder impingement syndrome. The medical evidence, and in particular the testimony of both Dr. Edwards and inferences from Dr. Ciliberto's testimony regarding injury to plaintiff's bursa, indicates that bursitis is a component of plaintiff's shoulder impingement injury. It is virtually impossible to separate out the bursitis component from the remainder of the shoulder injury. In determining the causal relationship between the plaintiff's shoulder condition and her employment, the undersigned has given greater weight to the opinion of her treating physician Dr. Ciliberto, which is consistent with the assessments of Dr. Tyler and Dr. Nanni, than to the opinion of Dr. Edwards, the IME physician.
17. Dr. Ciliberto has also advised the plaintiff to avoid jobs with overhead reaching and lifting. Plaintiff has returned to school to become a registered nurse. Dr. Tyler, Dr. Edwards and Dr. Ciliberto have each rendered an opinion that nursing duties could be performed without aggravating or worsening her upper extremity problems.
18. Plaintiff's shoulder problems developed prior to March 1998, and were first assessed in March 1998. Her subsequent employment resulted in symptoms of this condition. Her disability subsequent to May 1998 was a direct and natural result of and causally related to plaintiff's condition assessed in March 1998. Plaintiff's incidents subsequent to May 1998 all relate back to the initial condition assessed in March 1998, while defendant Travelers was on the risk.
19. According to the wage records of the employer in 1998, Plaintiff earned wages from Allied/Honeywell in the amount of $28,230.03. On May 11, 1998, Plaintiff's hourly wage was $15.62.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. As of on or about March 5, 1998, the plaintiff had developed a compensable occupational disease, bursitis, as well as tendonitis and consequent left shoulder impingement, as a result of her employment with Defendant Honeywell. N.C. Gen. Stat. §§ 97-53(17), 97-53(13).
2. At the time plaintiff developed her left upper extremities problems, Travelers Insurance Company was the carrier on the risk, and as such is responsible for her medical treatment and periods of temporary disability. N.C. Gen. Stat. §§ 97-53, 97-57.
3. The plaintiff's return to work after the filing of her first claim, using an aspirator hose and performing overhead lifting resulted in a reoccurrence of symptoms of the original bursitis and tendonitis. Plaintiff's disability subsequent to May 1998 was a direct natural result of and causally related to the condition assessed in March 1998. Defendant Travelers therefore is responsible for all subsequent medical treatment and any compensation for lost wages as of the June 15, 1998 claim. N.C. Gen. Stat. §§ 97-53, 97-57.
4. Defendant Travelers is responsible for payment of all expenses incurred for reasonably necessary medical treatment to the plaintiff's left shoulder. N.C. Gen. Stat. §§ 97-2(19), 97-25.
5. Defendant Travelers is responsible for payment to plaintiff of temporary total disability benefits during any periods plaintiff was unable to earn wages in her employment due to her left shoulder injury. As stipulated by the parties, plaintiff was unable to earn wages during the following periods: March 6, 1998 through April 30, 1998; May 14, 1998 through July 16, 1998; February 10, 1999 through April 5, 1999; and from March 1, 2001 and continuing until plaintiff returned to work. N.C. Gen. Stat. § 97-29.
6. For purposes of paying plaintiff compensation for wage loss, plaintiff's average weekly wage is calculated to be $542.88, yielding a compensation rate of $361.93. Plaintiff's compensation from March 1, 2001 forward is properly paid at this same rate given that her disability following March 1, 2001 was causally related to the 1998 incident. §97-2(5).
7. Defendant Travelers is responsible for paying plaintiff compensation for her ten percent permanent impairment rating or permanent partial wage loss. N.C. Gen. Stat. §§ 97-31, 97-30.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Defendant Travelers shall pay all expenses incurred by plaintiff for reasonably necessary medical treatment to the plaintiff's left shoulder and upper extremity, as outlined above in the Conclusions of Law.
2. Defendants shall pay Plaintiff compensation benefits during the following periods: March 6, 1998 through April 30, 1998; May 14, 1998 through July 16, 1998; February 10, 1999 through April 5, 1999; and from March 1, 2001 until plaintiff returned to work.
3. Defendant Travelers Insurance Company is responsible for the periods of compensation for wage loss at the rate of $361.93 per week. Defendant Travelers shall receive a credit for short-term disability payments made to the plaintiff. All accrued benefits shall be paid in a lump sum, subject to the attorney's fee.
4. Defendant Travelers shall pay, at the election of the plaintiff, compensation for partial incapacity benefits under N.C. Gen. Stat. § 97-30
or permanent partial impairment benefits under N.C. Gen. Stat. § 97-31 for 24 weeks.
5. A reasonable attorney's fee of twenty-five percent of the compensation awarded to Plaintiff is approved for her attorney.
6. Defendant Travelers shall pay the costs of this appeal.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/__________ PAMELA YOUNG COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER